MARGARET CHAMBERS,

     Plaintiff,

v.                       Case No. 8:16-cv-2131-T-33CPT

JAMES MATTIS, Secretary,
Department of Defense,[1]

     Defendant.

_____/

## ORDER

     This matter comes before the Court pursuant to the Motion for Summary Judgment filed by Defendant, the Secretary of the Department of Defense, on November 2, 2017 (Doc. # 34), with a response in opposition thereto filed by Plaintiff, Margaret Chambers, on December 19, 2017 (Doc. # 45), and a reply in support thereof filed by the Secretary on January 8, 2018 (Doc. # 46). For the reasons that follow, the Secretary's Motion (Doc. # 34) is granted.

## I.   Background

     Ms. Chambers brought suit in this case alleging employment discrimination under Title VII of the Civil Rights Act of 1964 based on her race (Count I) and gender (Count

---

[1] On January 20, 2017, James Mattis assumed office as the Secretary of the Department of Defense. Pursuant to Federal Rule of Civil Procedure 25(d), he has been substituted for Ashton Carter as the defendant in this action.

II), and in retaliation for filing complaints of discrimination (Count III). (Doc. # 1). On December 26, 2016, Ms. Chambers filed an amended complaint, raising substantially the same allegations but removing reference to a hostile work environment. (Doc. # 25). On December 26, 2016, the Secretary filed an answer, denying discrimination and retaliation, and raising several affirmative defenses. (Doc. # 28).

On November 2, 2017, the Secretary filed the instant Motion, seeking summary judgment on all three counts. (Doc. # 34). In response, Ms. Chambers indicated that she no longer intends to pursue "those counts in her federal complaint that concern alleged discrimination based on her race and sex." (Doc. # 45 at 1). Instead, she seeks to pursue only "her charge of retaliation" and responded in opposition only as it related to that count. (Doc. # 45 at 2). As such, the Court grants the Secretary's unopposed Motion for Summary Judgment as to Counts I and II, and addresses the opposed Motion as to Count III. The Motion is ripe for review.

## II. <u>Legal Standard</u>

### A. Summary Judgment

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56. Summary judgment will be granted unless there is a "genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1968) (emphasis in original). An issue is genuine if there is a "real basis in the record" on which "a reasonable jury could return a verdict for the non-movant." Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993). A fact is material if it might affect the outcome of the suit under the applicable substantive law. Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). If there is a conflict between the allegations or evidence, all reasonable inferences should be drawn in the non-moving party's favor. Shotz v. City of Plantation, 344 F.3d 1161, 1164 (11th Cir. 2003). However, if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Elec. Indus. Co. v. Zanith Radio Corp., 475 U.S. 574, 587 (1986).

**B. Retaliation**

In addition to prohibiting employment discrimination, Title VII of the Civil Rights Act of 1964 "forbids employer actions that 'discriminate against' an employee (or job applicant) because [s]he has 'opposed' a practice that Title VII forbids or has 'made a charge, testified, assisted, or participated in' a Title VII 'investigation, proceeding, or

hearing.'" <u>Burlington N. & Santa Fe Ry. Co. v. White</u>, 548
U.S. 53, 59 (2006) (quoting 42 U.S.C. § 2000e-3(a)).

In retaliation cases relying on circumstantial evidence,
the burden of production shifts between the parties. <u>Furcron
v. Mail Ctrs. Plus, LLC</u>, 843 F.3d 1295, 1310 (11th Cir. 2016)
(citing <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792
(1973)). Initially, the plaintiff must establish a prima
facie case by showing that "(1) she participated in a
statutorily protected activity; (2) she suffered a materially
adverse employment action; and (3) there is a causal
connection between the two." <u>Evans v. Books-A-Million</u>, 762
F.3d 1288, 1298 (11th Cir. 2014). If a prima facie case is
shown, the burden shifts to the defendant to articulate a
"legitimate, non-discriminatory reason for the adverse
employment action." <u>Bryant v. Jones</u>, 575 F.3d 1281, 1308 (11th
Cir. 2009). If the defendant satisfies its burden, "the burden
of production shifts to the plaintiff to offer evidence that
the alleged reason of the employer is a pretext for illegal
discrimination." <u>Wilson v. B/E Aerospace, Inc.</u>, 376 F.3d
1079, 1087 (11th Cir. 2004). Ultimately, this requires the
plaintiff to "establish that his or her protected activity
was a but-for cause of the alleged adverse action by the
employer." <u>Univ. of Tex. S.W. Med. Ctr. v. Nassar</u>, 570 U.S.
338, 362 (2013).

III. **Facts**

Ms. Chambers is a telecommunications specialist with the Defense Information Systems Agency, an agency within the Department of Defense. (Doc. # 35 at 6). DISA Central, a command field office of DISA, is located at MacDill Air Force Base. (Doc. # 35 at 6). DISA Central is further divided into several branches, CS1 through CS5. (Doc. #34-1 at 3, 30). Ms. Chambers joined DISA central in June of 2011, at which time she was assigned to CS4. (Doc. # 34-1 at 15). Eventually, she moved to CS2. (Doc. # 34-1 at 15).

In CS2, Ms. Chambers' immediate supervisor was Anthony "Tony" McFadden, the Branch Chief for CS2. (Doc. # 34-1 at 15). Mr. McFadden reported to Sidney Shafer, the Deputy Commander of DISA Central. (Doc. # 34-1 at 2). And Mr. Shafer reported to Colonel Aubrey Wood, the Commander of DISA Central. (Doc. # 34-1 at 2). Above Colonel Wood was Larry Huffman, DISA Director of Operations. (Doc. # 34-1 at 2).

A. **Merging and Un-merging of CS2 and CS4 Branches**

Effective August 1, 2012, Colonel Wood decided to merge CS2 and CS4. (Doc. ## 34-1 at 16, 35 at 17). The idea was to "bridge the gap between the infrastructure transport, voice, and data services provided by the CS2 branch and the enterprise services and applications carried on that infrastructure worked by CS4." (Doc. # 34-1 at 3). With the

5

merger, Ms. Chambers was given section lead responsibilities over Mark Laine and Victor Perez, two employees that transferred from CS4. (Doc. # 35 at 19). The CS4 employees were located in a separate building from CS2 and remained there until November of 2012. (Doc. # 34-1 at 82). In November, Mr. Laine and Mr. Perez moved into the CS2 building. (Doc. # 35 at 40). With the transition came conflict as Ms. Chambers felt several employees became adversarial toward her. (Doc. # 35 at 31). According to Ms. Chambers, both Mr. Laine and Mr. Perez were uncooperative with her, stating that they "just didn't" want to work with her in CS2. (Doc. ## 34-1 at 15, 35 at 46).

Ms. Chambers believed that the refusal to work with her was because of her race and sex. (Doc. # 34-1 at 17). However, at deposition, Ms. Chambers stated that she had "no idea what their issue was." (Doc. # 35 at 49). She also acknowledged that Mr. Laine and Mr. Perez were unhappy in the branch and frustrated because they felt she was receiving opportunities they were not. (Doc. # 35 at 30, 47-48, 56-57).

Mr. Laine clarified that he did not refuse to work with her, but did refuse to treat her as his supervisor, and rejected the suggestion that any conflict was a result of her race or sex. (Doc. # 34-1 at 77-78). Mr. Laine also perceived a "very toxic" environment in the branch, caused primarily by

a close personal relationship between Ms. Chambers and Mr. McFadden. (Doc. # 34-1 at 75–76). Although doubting it was sexual, Mr. Laine stated that the relationship made him uncomfortable. (Doc. # 34-1 at 75–76). It also seemed to Mr. Laine that Mr. McFadden was attempting to push Ms. Chambers into a "larger supervisory role" and that Mr. McFadden took little interest in the branch beyond how it could get Ms. Chambers promoted. (Doc. # 34-1 at 75–76). Mr. Perez was similarly reluctant to treat Ms. Chambers as his supervisor and rejected the notion that it had anything to do with her race or sex. (Doc. # 34-1 at 82, 84–85). He also identified "drama" within CS2 and corroborated the uncomfortable relationship between Ms. Chambers and Mr. McFadden. (Doc. # 34-1 at 83).

In addition to work environment issues, the merger caused logistical complications. In particular, the change in buildings created communication issues with the former CS4 employees and their customers. (Doc. ## 34-1 at 4, 100, 38 at 26). Also around this time, a Lieutenant Colonel resigned from the United States Air Force and Colonel Wood learned that the Air Force would not fill that position based on its placement in the DISA Central front office. (Doc. # 34-1 at 100). Additionally, Colonel Wood received approval to hire for a GS-14 position that was previously vacant in CS4. (Doc.

# 34-1 at 8, 101). Based on these factors, and Mr. Shafer's recommendation, Colonel Wood decided to reconstitute CS4. (Doc. ## 34-1 at 4, 36 at 42–44). The newly-reconstituted CS4 included the GS-14 as a supervisory position, which CS4 did not previously have (Doc. # 38 at 39), as well as Mr. Laine, Mr. Perez, and the Lieutenant Colonel position. (Doc. # 36 at 45).

On December 14, 2012, Colonel Wood sent an email announcing his decision to undo the merger and reconstitute CS4, effective January 1, 2013. (Doc. # 34-1 at 50, 101).

## B. Protected Activity

On January 3, 2013, Ms. Chambers contacted an Equal Employment Opportunity Counselor, alleging that the decision to reconstitute CS4 was discriminatory based on her race and sex. (Doc. # 34-2 at 2–3). Ms. Chambers argues that Colonel Wood simply decided to reconstitute CS4 rather than address the refusal of Mr. Laine and Mr. Perez to work with Ms. Chambers, which she alleged was based on her race and sex. (Doc. # 35 at 67). Ms. Chambers also accused Colonel Wood of conspiring to exclude Ms. Chambers from the GS-14 position and ensuring that it was filled by a white male. (Doc. # 35 at 67, 107). The informal complaint was handled by EEO counselor Cynthia Wilson. (Doc. # 34-2 at 6).

### C.    Climate Assessment Report

DISA usually conducts climate assessments every two years or upon a change in command, but they may also be conducted upon request. (Doc. # 34-2 at 30). The last climate assessment was done just prior to Colonel Wood assuming command. (Doc. # 36 at 35). In this case, an assessment was conducted at the request of Colonel Wood, upon hearing complaints of "a potential hostile work environment impacting the morale and welfare of the employees." (Doc. # 34-2 at 30). Specifically, Colonel Wood testified that he was receiving complaints of unprofessional conduct and an unprofessional relationship in CS2. (Doc. # 36 at 32).

After receiving complaints about CS2, Colonel Wood called his supervisor, Mr. Huffman, in DISA Headquarters to discuss how to proceed. (Doc. # 36 at 33, 37). Upon his advice, he called the Equal Employment Opportunity office in DISA Headquarters. (Doc. ## 36 at 33, 39 at 48). On April 16, 2013, Chandra Vickers, director of the EEO Office, flew to Tampa to conduct EEO training and make herself available for employees to raise any concerns. (Doc. # 39 at 109–10). After speaking with the employees, Ms. Vickers "confirmed some of the things that Colonel Woods had been hearing," and determined that it was necessary to conduct a complete climate assessment, which began on April 29, 2013. (Doc. # 39 at 125–

26).

The goal of the climate assessment is to get an "accurate, unbiased representation" of the work environment. (Doc. # 34-2 at 30). This is determined primarily through focus groups with the relevant groups in DISA: "Branch Chiefs, Deputy Branch Chiefs, non-supervisory employees, Officers, Senior Enlisted Military, Enlisted Military (E-6 and below), and contractors." (Doc. # 34-2 at 30). Participants are also offered one-on-one sessions to bring specific concerns. (Doc. # 34-2 at 30). In this case, there were twenty-three one-on-one sessions. (Doc. # 34-2 at 30).

For the non-supervisory employees, separate group sessions were conducted with each branch and one make-up session. (Doc. # 34-2 at 36). The report combines some information to preserve anonymity between the branches. (Doc. # 34-2 at 36). Under morale, however, the report notes the main reasons provided in each of the branches for the relatively low morale. (Doc. # 34-2 at 37). For CS2, the report provided the following reasons:

- Toxic working conditions due to a perceived relationship between CS2 Branch Chief Anthony "Tony" McFadden and [Ms. Chambers]. Employees felt that Ms. [Chambers] received employment perks that male employees did not receive, such as the ability to come in late every day, not work a full 10 hour day, and still be allowed to take off for a CWS day. The employees also stated that Ms. [Chambers] was rude and unprofessional

toward them and the Branch Chief allowed it to occur. The employees stated that prior to Ms. [Chambers] becoming the unofficial "Deputy Branch Chief" the morale among CS2 employees was around 8 or 9; however, since Ms. [Chambers] became powerful within the branch, the male employees said morale is about a 4-5 (possible high of 10).

- Employees stated that Ms. [Chambers] appeared to have an anger management problem and they hated to engage her in any conversations they did not absolutely have. Employees stated that Ms. [Chambers] frequently spent time sitting on the Branch Chief's desk; made the Branch Chief's lunch or went to lunch with the Branch Chief; took long walks with the Branch Chief and attempted to manipulate situations to keep the CS2 male employees from speaking to the Branch Chief. Additionally, Ms. [Chambers] and the Branch Chief (Tony McFadden) appeared to be in collusion to keep the actual Deputy Branch Chief (LTC [redacted]) from receiving or providing information. There have been several occasions where employees witnessed the Deputy being excluded from conversations he should have been involved in. The employees stated that on one occasion, the Branch Chief (Tony McFadden) asked the Deputy (LTC [redacted]) to leave a meeting because they were going to discuss "civilian only" issues. On another occasion cited by employees, LTC [redacted] walked into a work related discussion, and Ms. [Chambers] looked at him and asked, "Can I help you?"

- The employees also stated that some of them are no longer allowed to speak to the contractors regarding work related issues. All discussion must go through Ms. [Chambers], which was negatively impacting the mission. They viewed Ms. [Chambers] as technically incompetent.

- Employees stated that when Ms. [Chambers] was out of the office, the mood of the office soared, and people begin to feel like their old selves again; but once she returned the morale went back to being poor.

- The employees previously enjoyed a good working relationship with the Branch Chief and seem to be at a loss to explain what has happened to

> their branch. No one seemed to want to come right
> out and accuse Tony McFadden of having an affair
> with [Ms. Chambers], but it was clear from their
> accounts of what is going on in the office that
> they are thinking it must be a possibility. The
> employees have lost faith in Tony McFadden's
> leadership ability at this point and can't
> understand how he has let this happen to the
> branch, when they used to be such a cohesive unit
> enjoying barbecues and after hour functions
> together.

(Doc. # 34-2 at 37–38). Although her name is redacted from

the copy provided to the Court, Ms. Chambers acknowledges

that the allegations in the report reference her and her

relationship with Mr. McFadden. (Doc. ## 35 at 112–24, 34 at

10–12, 45 at 2–3).

Under work environment, the report went on to state that

the CS2 employees were:

> happy with their work environment, with the
> exception of the perceived hostile work environment
> created by Mr. Tony McFadden and Ms. [Chambers].
> The employees stated that if Ms. [Chambers] was no
> longer part of their branch, they believed they
> would go back to being a functional and efficient
> branch. As long as she stayed, however; the mission
> and morale of the DISN Branch would continue to
> suffer.

(Doc. # 34-2 at 39–40).

As for the contractors, the group session was attended

primarily by contractors from the CS2 Branch. (Doc. # 34-2 at

40). The morale was even worse. The assessment found:

> The morale among the CS2 contractors was rated as
> 1 on a scale of 1 to 10. They stated they would
> have rated it in the negatives if they had been

given that option. The group has been negatively impacted by their government lead, Ms. [Chambers]. The group, which was comprised of all males, stated that Ms. [Chambers] was allowed to come in when she pleased, never on time, but usually at least an hour late. The Branch Chief already allows her to come in later than anyone else in the branch and she is usually at least an hour late (the rest of the branch begins the workday at either 0600 or 0700. Ms. [Chambers] is allowed a start time of 0800). Additionally, the group stated that Ms. [Chambers] is the benefactress of sexual favoritism[2] by the Branch Chief in many other areas. Ms. [Chambers] has her own key to the Branch Chief's office (which used to be kept in a key box for facility issues) and when the Branch Chief was out of the office, she unlocks his office and works in there. Also, the group stated that Ms. [Chambers] was frequently observed sitting on the Branch Chief's desk, and when not sitting on his desk, she would take a chair and sit next to him, behind his desk when meeting with them. The contractors stated that their morale used to be good, until about six months ago when the office suddenly changed and the Branch Chief deemed Ms. [Chambers] his "unofficial" deputy. Following that verbal announcement about six months ago, the morale in the office went downhill. Ms. [Chambers] began speaking to the contractors and government employees in a condescending manner, withholding information necessary for them to perform their jobs efficiently, and has severed the communication between the previous government lead and the contractors. The mission is paying the price for this power play on the part of Ms. [Chambers]. It was unclear what exactly the nature of the relationship is between Ms. [Chambers] and Mr. McFadden. No one would come out and accuse them of having an affair, but it was strongly implied.

(Doc. # 34-2 at 40-41) (footnote in original). As for the

---

[2] **Sexual Favoritism** is a form of sexual harassment and discrimination that is illegal. It occurs when a manager or supervisor is in a sexual relationship or a perceived sexual relationship with another employee and the manager/supervisor shows favoritism toward that employee such as by promoting them ahead of other, more qualified candidates.

contractors' work environment, the assessment found:

> The majority of the contractors feel they were being subjected to a hostile and toxic environment, which is currently impeding accomplishment of the mission. The CS2 contractors cited the recent change in their government lead as the cause of all the friction/hostility. The group stated that they are spending each day "walking on eggshells" because they fear that their current government lead, Ms. [Chambers] will decide to get rid of them if they cross her. The group stated that they have been forbidden to speak to their previous government leads (Mr. [redacted] and Mr. [redacted]). The group stated that Ms. [Chambers] has frozen out the previous government leads, although they are technical experts in reference to the work the contractors are performing. The contractors felt that Ms. [Chambers] has become a roadblock to accomplishing the mission. The contractors stated they were embarrassed when they had to attend meetings with her due to her lack of knowledge. The contractors stated that Ms. [Chambers] [is] technically deficient, inordinately rude and unprofessional, and at times has violent tendencies (such as slamming her fist on the table and scattering M&Ms across the room or stating that she needed to "count to ten" before engaging in conversation with them so she would calm her anger and not resort to violence). The contractors in CS2 stated they were all looking for other jobs because the workplace climate had become intolerable. The group stated that even though the majority of them had worked with Ms. [Chambers] for close to two years, she still did not know their names or what jobs they performed. Whether or not Ms. [Chambers] was intentionally calling them by the wrong names is unclear, however it was unacceptable either way. There were only about 15 people that worked in the CS2 building (805), Ms. [Chambers] should know their names by now.

(Doc. # 34-2 at 41).

As a result of these findings, the report recommended a "reassignment for Ms. [Chambers] outside of Building 805 and

not under the supervision of Mr. Anthony 'Tony' McFadden,"
noting that "Mr. McFadden and Ms. [Chambers'] failure to
remain professional has proven to be the impetus to many of
the situations mentioned by employees within CS2." (Doc. #
34-2 at 43). After he received the written climate assessment
report, Colonel Wood reviewed it with other leadership in
DISA, including the EEO Office, Office of the General Counsel,
and Personnel, and the consensus was to transfer Ms. Chambers
to a similar position in CS3. (Doc. ## 36 at 55, 38 at 73).

### D.    Reassignment to CS3

After logging into a personnel system on June 20, 2013,
Ms. Chambers discovered that she had been reassigned to CS3.
(Doc. # 34-1 at 87). She immediately emailed Mr. Shaffer, who
responded that Colonel Wood intended to reassign some
employees and that Colonel Wood would be in later that day.
(Doc. # 34-1 at 89). She later met with Colonel Wood, who
informed her that she was being reassigned as a result of the
climate assessment. (Doc. # 34-1 at 88).

On June 24, 2013, Ms. Chambers received the official
memorandum ordering her transfer to CS3. (Doc. ## 34-1 at 89,
34-2 at 74). Ms. Chambers reported to CS on June 28, 2013.
(Doc. # 34-1 at 90). Shortly before her transfer and also as
a result of the assessment, Mr. McFadden was granted his
previously requested assignment to Special Operations Command

15

on a temporary basis, which eventually became permanent. (Doc. ## 34-2 at 61, 37 at 7).

In CS3, Ms. Chambers has the same job title with the same pay rate. (Doc. # 35 at 143-44). However, she no longer is a section lead. (Doc. # 35 at 10). Ms. Chambers alleges that her new position has "has no upward mobility potential and lack[s] supervisory responsibilities." (Doc. # 34-1 at 88). She also alleges that she has less meaningful work and is often idle. (Doc. # 35 at 194-95).

## IV.  Legal Analysis

With regard to the prima facie case of retaliation, the Secretary does not dispute that Ms. Chambers participated in a statutorily protected activity or that she suffered a materially adverse employment action. Instead, the Secretary argues that the transfer of Ms. Chambers was not causally related to her protected activity and that Ms. Chambers cannot show that the reason for the transfer was mere pretext for retaliation. (Doc. # 34 at 21-23). The Court agrees with the Secretary.

### A.  Causal Connection

To demonstrate a causal connection, Ms. Chambers must "'show that the decision-makers were aware of the protected conduct, and that the protected activity and the adverse actions were not wholly unrelated.'" Shannon v. Bellsouth

Telecomm., Inc., 292 F.3d 712, 716 (11th Cir. 2002) (quoting

Gupta v. Fla. Bd. of Regents, 212 F.3d 571, 590 (11th Cir.

2000)). The Secretary does not dispute that Colonel Woods was

aware of Ms. Chambers' complaints of discrimination, but

correctly argues that "there is no evidence other than timing"

connecting Ms. Chambers' activity and her transfer. (Doc. #

34 at 21). Yet, even the timing is insufficient to establish

causation here.

Causation may be shown by establishing "close temporal

proximity between the statutorily protected activity and the

adverse employment action." Thomas v. Cooper Lighting, Inc.,

506 F.3d 1361, 1364 (11th Cir. 2007). "But mere temporal

proximity, without more, must be 'very close.'" Id. (quoting

Clark Cty. Sch. Dist. V. Breeden, 532 U.S. 268, 273 (2001)).

Courts have consistently held that a three to four month

window between the protected activity and the employment

action is insufficient to establish causation. See Clark, 532

U.S. at 273–74 (citing Richmond v. ONEOK, Inc., 120 F.3d 205,

209 (10th Cir. 1997) (holding that a three-month period was

insufficient); Hughes v. Derwinski, 967 F.2d 1168, 1174 (7th

Cir. 1992) (holding that a four-month period was

insufficient)). See also Thomas, 506 F.3d at 1364 (holding

that "in the absence of other evidence tending to show

causation, if there is a substantial delay between the

protected expression and the adverse action, the complaint of retaliation fails as a matter of law").

Here, Ms. Chambers first contacted an EEO counselor on January 3, 2013. (Doc. # 34-2 at 2). She filed her formal complaint of discrimination on February 8, 2013. (Doc. # 25 at 2). It was not until late June of 2013, that Ms. Chambers was transferred to CS3. (Doc. # 34-2 at 74). Standing alone, this three to four month gap is not a sufficient temporal proximity to establish causation.

Ms. Chambers seeks to add a link in the chain of causation by arguing that Colonel Wood requested the climate assessment after learning that Ms. Chambers was alleging discrimination. (Doc. # 45 at 6–7). However, for purposes of temporal proximity and causation, the relevant timeframe is measured from the protected activity and the adverse employment action. See Rives v. Lahood, 605 Fed. App'x 815, 819 (11th Cir. 2015) (citing Donnellon v. Fruehauf Corp., 749 F.2d 598, 601 (11th Cir. 1986)). Requesting a climate assessment of the entire field office cannot reasonable be called a materially adverse employment action. See Burlington, 548 U.S. at 68 (holding that a materially adverse action is one which might have "dissuaded a reasonable worker from making or supporting a charge of discrimination") (internal quotations omitted).

**B.    Pretext**

Assuming Ms. Chambers had established her prima facie case, the Secretary has met the "'exceedingly light'" burden of providing "legitimate, non-discriminatory reasons" for the employment action. See Holifield v. Reno, 115 F.3d 1555, 1564 (11th Cir. 1997) (quoting Turnes v. AmSouth Bank, N.A., 36 F.3d 1057, 1061 (11th Cir. 1994)). Specifically, the Secretary argues that Colonel Woods transferred Ms. Chambers based on the results and recommendation of the climate assessment report, which described a "terrible work environment in CS2." (Doc. # 34 at 21–22). This is sufficient evidence upon which a rational trier of fact could conclude that the transfer was not based on retaliatory animus. See Texas Dep't of Cmty Affairs v. Burdine, 450 U.S. 248, 257 (1981); see also Holifield, 115 F.3d at 1564 (finding that the defendant "clearly met its burden" by relying on a report that noted the department "was in a state of crisis, due largely to the demoralization of the staff resulting from Holifield's behavior").

Thus, the burden once again falls on Ms. Chambers to show that reliance on the climate assessment was mere pretext and her protected activity was the but-for cause of her transfer. See Gloetzner v. Lynch, 225 F. Supp. 3d 1329, 1358–59 (N.D. Fla. 2016). This requires her to "meet the reason

proffered head on and rebut it," _Crawford v. City of Fairburn, Ga._, 482 F.3d 1305, 1308 (11th Cir. 2007), by presenting "concrete evidence in the form of specific facts which show that the defendant's proffered reason is mere pretext. Mere conclusory allegations and assertions will not suffice." _Earley v. Champion Int'l Corp._, 907 F.2d 1077, 1081 (11th Cir. 1990). The concrete evidence "must demonstrate 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" _Alvarez v. Royal Atl. Developers, Inc._, 610 F.3d 1253, 1265 (11th Cir. 2010) (quoting _Combs v. Plantation Patters_, 106 F.3d 1519, 1538 (11th Cir. 1997)). Ms. Chambers has not met this burden.

In attempting to rebut the reason for the transfer, Ms. Chambers argues essentially that the entire climate assessment was fabricated by Colonel Woods and Ms. Vickers to justify retaliating against Ms. Chambers. (Doc. # 45 at 7, 11). However, this conclusory accusation is unsupported by the record. See _Evers v. Gen. Motors Corp._, 770 F.2d 984, 986 (11th Cir.1985) ("This court has consistently held that conclusory allegations without specific supporting facts have no probative value.").

Ms. Chambers places great emphasis on the fact that Ms.

Vickers was in charge of both the climate assessment and Ms. Chambers' EEO investigation. (Doc. # 45 at 7–8, 11). While Ms. Vickers did conduct the climate assessment, along with another employee (Doc. # 39 at 32), there is no evidence that she played an active role in Ms. Chambers' investigation. On the contrary, she testified that she does not conduct EEO investigations and that they usually rely on an investigative branch of the Department of Defense to do so. (Doc. # 39 at 93–94). Further, knowledge of, or participation in, Ms. Chambers' investigation has no tendency to prove that Ms. Vickers colluded with Colonel Woods to fabricate the climate assessment.

Ms. Chambers also calls into question the results of the climate assessment by pointing out that a previous assessment was conducted in August of 2012, which did not reveal a toxic environment. (Doc. # 45 at 7). However, Ms. Chambers acknowledged that she did not become a section lead until August of 2012. (Doc. # 35 at 159). As noted in the climate assessment, both the non-supervisory employees and the contractors reported that morale in CS2 dropped upon Ms. Chambers becoming the "unofficial 'Deputy Branch Chief.'" (Doc. # 34-2 at 37, 40).

Finally, Ms. Chambers attempts to discredit the climate assessment by refuting or contextualizing certain findings in

the report. (Doc. # 45 at 9–10). For example, although Ms. Chambers argues that she never had to count to ten to ease her anger, she admits that she did pound her fist on the table, but only because she was being yelled at. (Doc. # 45 at 9–10). However, this argument misses the mark entirely. "The inquiry into pretext centers on the employer's beliefs, not the employee's beliefs and, to be blunt about it, not on reality as it exists outside of the decision maker's head." Alvarez, 610 F.3d at 1266.

Therefore, even if the Court accepts Ms. Chambers' argument that her fellow employees lied or exaggerated about her (Doc. ## 45 at 10, 35 at 129), Ms. Chambers has provided no concrete evidence that Colonel Woods had any suggestion the climate assessment report was inaccurate. See Murphree v. Comm'r, 644 Fed. App'x 962, 968 (11th Cir. 2016) (finding that the plaintiff's contentions did not show that the investigative report "was false or that the findings in the report were not the true reason for the employment decisions"); Mealing v. Ga. Dep't. of Juvenile Justice, 564 Fed. App'x 421, 428 (11th Cir. 2014) (finding that the plaintiff did not establish that the plaintiff's reprimands were false or that the director who recommended termination had any knowledge of any alleged fabrication).

It is not the role of this Court to determine whether

there was a toxic environment in CS2, whether the employees conducting the climate assessment should have interviewed more people, or whether Colonel Woods should have taken another course of action. <u>Wilson</u>, 376 F.3d at 1092 ("The role of this Court is . . . not to act as a super personnel department that second-guesses employers' business judgments.") (internal quotations omitted). Instead, the issue before the Court is whether Ms. Chambers has put forth sufficient evidence upon which a reasonable fact finder could conclude that reliance on the climate assessment report is so implausible or incoherent as to be unbelievable. <u>Alvarez</u>, 610 F.3d at 1265. She has not.

As such, even viewing the evidence in the light most favorable to her, Ms. Chambers has not created a genuine issue of material fact and summary judgment is warranted.

Accordingly, it is

**ORDERED, ADJUDGED,** and **DECREED:**

(1) The Secretary's Motion for Summary Judgment (Doc. # 34) is **GRANTED**,

(2) The Clerk shall enter judgment accordingly and **CLOSE** this case.

**DONE** and **ORDERED** in Chambers in Tampa, Florida on this

8th day of March, 2018.

VIRGINIA M. HERNANDEZ COVINGTON
UNITED STATES DISTRICT JUDGE